JUN 22 2021 PM 8:57
FILED - USDC - ~~~~ ~~

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,
  *Plaintiff,*

v.

CONTENTS OF CHASE BANK ACCOUNT
ENDING IN 3988, HELD IN THE NAME
OF NAIMETULLA A. SYED and
SHAHNAZ T. SYED.
  *Defendant.*

No.

3: 21 mc 33 (SDV)

### AFFIDAVIT OF EMMA DUGAS

I, Emma Dugas, being duly sworn, do state that:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"). I am currently assigned to the Hartford, Connecticut Field Office. I have been employed as a Special Agent with HHS-OIG since January 2019.

2.     I received my Bachelor of Science in Nursing degree from the University of Connecticut in 2011 and received a certification in hospice and palliative care nursing in 2015. I am also a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.     Previously, I was employed as a registered nurse in Connecticut for approximately eight years.  As a registered nurse, I worked in both the pediatric hematology and oncology and hospice settings.   I worked with various types of opioids in different forms, including oral medications such as oxycodone, methadone, morphine, and dilaudid, as well as intravenous or subcutaneous formulations of morphine, dilaudid, and fentanyl.

4.     As an HHS-OIG Special Agent, I am responsible for investigating allegations of fraud against the various programs under HHS's jurisdiction, including the Medicare and Medicaid programs.  I have participated in numerous investigations involving those programs and have interviewed witnesses, conducted surveillance, reviewed claims data, medical records and other business records.  I have also assisted with the execution of search and arrest warrants.

5.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

6.     Along with other Special Agents from HHS-OIG and the Drug Enforcement Administration (DEA) I am investigating psychiatrist Dr. Naimetulla Ahmed SYED and others known and unknown, for criminal offenses including health care fraud in violation of 18 U.S.C. §§ 1347 and 1035 and prescribing a controlled substance without a legitimate medical purpose or outside the usual course of professional practice, in violation of 21 U.S.C. § 841 (together the "**Target Offenses**").

7.     I submit this affidavit in support of a civil forfeiture seizure warrant.  I believe that the funds held in Chase Bank Account Ending in 3988, held in the name of Naimetulla A. Syed and Shahnaz T. Syed, were obtained by knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program; or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in violation of 18 U.S.C. § 1347 and/or constitute proceeds prescribing a controlled substance without a legitimate medical purpose or outside the usual course of professional practice in violation of 21 U.S.C. § 841 and are therefore, subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and/or 21 U.S.C. § 881(a)(6).

I request that the Court issue a seizure warrant for the defendant account pursuant to 18 U.S.C. 981(b).

8.     I base this affidavit upon my personal knowledge, upon information and documents provided to me by other investigators assigned to this investigation, and upon information and documents provided by third parties.  I have not included each and every fact known to me from the investigation; rather, I have submitted sufficient information to establish probable cause for the requested warrants.

## JURISDICTION

9.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711 and 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND

### I.     The Medicare Program

10.     The Medicare program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), administers Medicare.  Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

11.     Individuals who qualify for Medicare benefits are commonly referred to as Medicare beneficiaries.  Each beneficiary is assigned a unique Health Insurance Claim Number ("HICN").

12.     Medicare "Part B" pays for medically necessary outpatient medical services. Medicare authorizes payment for outpatient services if the care was actually provided and was medically

necessary; that is, the services were required because of disease, disability, infirmity, or impairment. Medicare will not pay for services and treatment that were not actually provided or for which that patient did not meet the criteria necessary to justify the claimed service or treatment.

13.     Medicare "Part D" covers prescription drugs.  This coverage is an optional benefit offered to everyone who has Medicare.  For patients to receive Medicare drug coverage, they must join a Medicare plan that offers prescription drug coverage.  Each plan can vary in cost and drugs covered.

14.     To enroll in Medicare, all providers are required to submit a Medicare enrollment application to CMS.  In submitting the Medicare application, health care providers certify that they understand and will abide by the federal laws and regulations governing their participation in Medicare.  When Medicare approves a provider's application, Medicare issues the provider a unique provider number.  Medicare uses the unique provider number to identify the rendering provider of the service in claims submitted for payment.

15.     SYED has been enrolled in as Medicare provider since January 5, 1996.

16.     A Medicare provider may file claims with Medicare to obtain reimbursement for services provided to beneficiaries.  A Medicare claim is required to set forth, among other things, the beneficiary's name and HICN, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.  Each time a provider submits a claim to Medicare, the provider certifies that the claim is true, correct and complete, and complies with all Medicare laws and regulations.  The claims are generally submitted electronically.

17.     Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), covered entities, such as a physician billing Medicare, are required to retain required

documentation of patient care for six years from the date of the creation of the record or the date when the record was last in effect, whichever is later.  According to § 19a-14-42 of the Connecticut Public Health Code Medical Records Regulations, health care providers in Connecticut are required to maintain parts of a patient's medical record for a period of seven years from the date of last treatment, or, upon the death of the patient, for three years.  The same regulation provides that lab reports must be kept for at least five years, although only positive (abnormal) lab reports need be retained.  The regulations further state that nothing in the regulations prevent a practitioner from retaining records longer than the required minimum.

## II.     The Medicaid Program in Connecticut

18.     The Connecticut Department of Social Services ("DSS") provides medical assistance to low-income persons and people who could otherwise support themselves if not for the fact that they have excessive health care costs. DSS provides this assistance through the Connecticut Medical Assistance Program (CTMAP).   CTMAP offers a comprehensive health care benefit package that includes the following:

a.      HUSKY A - Family Medicaid;

b.      HUSKY B - State Children's Health Insurance Program ("SCHIP");

c.      HUSKY C - previously referred to as Medicaid, Title XIX, fee-for-service, or Adult Medicaid; and

d.      HUSKY D - previously referred to as Medicaid for Low Income Adults ("MLIA").

19.     The HUSKY programs identified above are joint federal-state government programs designed primarily to finance the provision of the medical services to the indigent. This affidavit refers to the various HUSKY programs above collectively known as "Medicaid." DSS administers these Medicaid programs in Connecticut.  The Medicaid program is administered at the federal level by the Centers for Medicare and Medicaid Services ("CMS") and is funded approximately

50 percent by the federal government.  The remaining approximately 50 percent is funded by the State of Connecticut.

20.     Medicaid is a public plan or contract that pays claims submitted by participating health care providers for medically necessary benefits, items, and services rendered to Medicaid members. As such, Medicaid is a "health care benefit program" under 18 U.S.C. § 24(b).

21.     Participating providers in the Medicaid program agree to comply with certain general provider requirements.  These requirements are outlined on the provider enrollment application. According to these requirements, providers must maintain all records for a minimum of five years or for the minimum amount of time required by federal or state law governing record retention, whichever period is greater.

22.     In addition, Providers agree not to bill clients or any other party for any additional or make-up charge for services covered by the Connecticut Medical Assistance Program, excluding any cost sharing, as defined in section 17b-290(6) of the Connecticut General, and as permitted by law, even when the Program does not pay for those covered services for technical reasons, such as a claim not timely filed or a client being managed-care eligible, or a billed amount exceeding the program allowed amount.  The provider may charge an eligible Connecticut Medical Assistance Program client, or any financially responsible relative or representative of that individual, for goods or services that are not covered under the Connecticut Medical Assistance Program, only when the client knowingly elects to receive the goods or services and enters into an agreement in writing for such goods or services prior to receiving them.

23.     Since April 1, 1986, SYED has been enrolled as a Medicaid provider and his provider number is 001234780.  According to SYED's DSS reenrollment application dated April 21, 2018, SYED does not store his patient records electronically. In addition, according to SYED's Medicare

enrollment application dated April 24, 2019, he indicates that he utilizes paper storage for patient records.

### III.    How Providers Bill Medicare and Medicaid: CPT Codes

24.     To bill health care benefit programs such as Medicaid, providers use a five-digit number, known as a Current Procedural Terminology ("CPT") code, that identifies the nature and complexity of the service provided. The CPT codes are listed in a manual published annually by the American Medical Association. CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered. Virtually every medical procedure has its own CPT code and insurance companies pay a specified amount of money for each CPT code billed. Within the CPT manual, there is also another set of health care procedure codes, known as Healthcare Common Procedure Coding System, or HCPCS, that identify products, supplies and services not otherwise identified in the CPT manual.

25.     Typically, providers submit CPT and HCPCS codes using a claim form, known as a CMS 1500. The CMS 1500 form, completed by the provider or their billing contractor, includes, among other information, the name and provider number of the provider who rendered the service; the name of the patient who received the service; the date the service was performed; a code delineating where the service was provided; the procedure that was rendered (identified by CPT code); and the diagnosis of the patient's condition for which the service was rendered. Most providers, including SYED, submit claims to Medicaid and other health care benefit programs electronically.

26.     When a provider submits a claim, the provider certifies that the services identified on the form were "medically indicated and necessary for the health of the patient."

27.     SYED bills Medicaid and Medicare for routine office visits, specifically using CPT codes 99213 and 99214.  According to the 2020 CPT manual, CPT codes 99213 and 99214 are described as follows:[1]

    a.    CPT 99213: Office or other outpatient visit for the evaluation and management of an established patient. Usually the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient or family. Requires at least two of the following three key components:

        i.   An expanded problem focused history.

        ii.   An expanded problem focused examination.

        iii.   Medical decision making of low complexity.

    b.    CPT 99214: Office or other outpatient visit for the evaluation and management of an established patient.  Usually the presenting problem(s) are of moderate to high severity.  Physicians typically spend 25 minutes face-to-face with the patients or family.  Requires at least two of the three key components:

        i.   A detailed history.

        ii.   A detailed examination.

        iii.   Medical decision making of moderate complexity.

28.     In addition, SYED bills Medicaid and Medicare for certain psychotherapy CPT codes, including 90792, 90833, and 90836.  According to the CPT manual, these codes are described as psychotherapy codes:

    a.    CPT 90792: Psychiatric diagnostic evaluation with medical services.

    b.    CPT 90833: Psychotherapy, 30 minutes, with patient when performed with an evaluation and management service.

    c.    CPT 90836: Psychotherapy, 45 minutes, with patient when performed with an evaluation and management service.

---

[1] In 2021, the CPT manual changed the definition of codes 99213 and 99214.

29.     These pscychotherapy CPT codes are time-based codes, meaning that documentation must indicate the amount of time spent providing psychotherapy services including a start and stop time.  According to the CPT manual, the amount of time spent providing psychotherapy does not include the evaluation and management time.

## IV.     Controlled Substance Regulations

30.     The Controlled Substance Act ("CSA"), 21 U.S.C. § 801 et seq. and its implementing regulations, govern the possession, manufacture, distribution, dispensing, administering, and prescribing of controlled substances within the United States.   The CSA provides that a prescription for a controlled substance must be issued for a legitimate medical purpose by a practitioner acting in the usual course of her professional practice.

31.     The CSA further provides that all persons who issue prescriptions for controlled substances must be registered with the DEA at any location where controlled substances are stored, dispensed, or administered.  If a practitioner does not store, administer, or dispense controlled substances, he is required to be registered at his primary business location where prescriptions for controlled substances are written.  Under the CSA, a home address is acceptable if it is the location of the practitioner's place of practice.

32.     In Connecticut, in order to prescribe controlled substances, in addition to the DEA registration, physicians are required to have a medical license and state-issued controlled substance certificate.

33.     In 2000, Congress passed the Drug Abuse Treatment Act of 2000 (DATA), codified at 21 U.S.C. § 823(g). DATA authorizes practitioners who have undergone specialized training and who are properly registered with the DEA to treat a certain number of narcotic-addicted patients for their addiction in an office-based setting with Schedule III-V controlled substances ("DATA-

Waived practitioners"). These practitioners are commonly referred to as Office Based Opioid Treatment, or "OBOT" Physicians. Currently, the only controlled substance approved by the Food and Drug Administration for dispensing and/or administering to narcotic-addicted patients to treat their addiction in an office-based setting is buprenorphine, a Schedule III controlled substance. Buprenorphine is the generic name for Suboxone.

34.     Oxycodone hydrochloride ("Oxycodone"), a Schedule II[2] narcotic drug, is a synthetic opioid analgesic medication generally prescribed for the relief of moderate to severe pain. Oxycodone has a serious potential for abuse. Often drug abusers crush the pill and snort, ingest or inject it. Oxycodone used in this fashion produces a heroin-like euphoria. Oxycodone is a highly addictive drug. As with most opiates, oxycodone abuse may lead to dependence and tolerance. Based on my training and experience, it is uncommon for a psychiatrist to prescribe oxycodone to patients as this medication is for pain control.

35.     Based on my training and experience, many drug-seeking patients also try to obtain prescriptions for benzodiazepines, such as alprazolam, lorazepam, or diazepam. Benzodiazepines are a class of psychoactive drugs that produce central nervous system depression and are mostly used to treat conditions such as anxiety, insomnia, and seizures. I am aware that drug users refer to the combination of an opiate and benzodiazepine as a "drug cocktail." I am also aware, based on my training and experience, that the addition of a benzodiazepine to an opiate, intensifies the high for the user. If not monitored closely, the combination of opiates and benzodiazepine can cause deaths because they significantly depress the central nervous system Based on my training and experience, these instances may indicate the doctor is prescribing outside the scope of legitimate medical practice.

---

[2] The DEA defines "Schedule II drugs, substances, or chemicals … as drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence."

36.     Dextroamphetamine-amphetamine (Adderall) is a schedule II narcotic, which contains a combination of amphetamine and dextroamphetamine.  Amphetamine and dextroamphetamine are central nervous system stimulants that affect chemicals in the brain and nerves that contribute to hyperactivity and impulse control.  Adderall is used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy.  Adderall has a high potential for abuse.  When combined with other medications such as opioids or benzodiazepines Adderall can mask some of the side effects of the opioids or benzodiazepines initially such as respiratory depression and increased sedation.  However, when the Adderall wears off, the side effects of the benzodiazepines or opioids remain.  This can be very dangerous and cause the patient to accidentally overdose and die.

**V.     Dr. Naimetulla Ahmed SYED**

37.     On September 7, 1982, SYED obtained a license to practice medicine in Connecticut.  SYED's medical license is currently active.  According to the Connecticut Department of Public Health physician profile, SYED's specialty is listed as "psychiatry" with no subspecialty listed such as pain medicine or pain management.

38.     According to the National Plan and Provider Enumeration System (NPPES) National Provider Identifier (NPI) website, SYED's primary taxonomy is Psychiatry and Neurology Psychiatry.  According to the American Psychiatric Association (APA) website, psychiatry is described as the branch of medicine focused on the diagnosis, treatment and prevention of mental, emotional and behavioral disorders.  A psychiatrist is a medical doctor who specializes in mental health, including substance use disorders.  Psychiatrists are qualified to assess both the mental and physical aspects of psychological problems.  According to the APA, psychiatrists can complete specialized training after their four years of general psychiatry training.  These specialties can include areas such as child and adolescent psychiatry, geriatric psychiatry, addiction psychiatry,

and pain medicine.  SYED is not known to specialize in any of these areas according to the NPPES NPI website.

39.     Based on my training and experience, I know that it is uncommon for a psychiatrist that does not specialize in pain management to prescribe narcotic pain medications such as oxycodone. If a patient is having pain and it is affecting their mental health, these patients are usually referred to a pain management physician instead. It is very common for psychiatrists and other physician specialties to collaborate with one another in order to ensure the patient receives comprehensive medical care, rather than the psychiatrist providing medications for symptoms that they do not specialize in.

40.     SYED is currently a sole practitioner practicing medicine at the Danbury Office and the New Haven office.   SYED currently holds two DEA controlled substances registrations: (i)  DEA Registration AS2469838 associated with 300 Hebron Avenue, Suite 215, Glastonbury, CT 06033; which was his place of professional practice at the time of the original registration, and (ii) DEA Registration AS2538114 associated with SYED's residence.

41.     According to DEA records, SYED first registered with the DEA on November 19, 2002.  As of October 24, 2016, SYED, is authorized under DATA to treat up to 275 narcotic-addicted patients. SYED's DEA Registration AS2469838 is associated with his DATA-Waived privileges to provide opiate addiction treatment.

42.     Since April 1, 1986, SYED has been enrolled as Medicaid provider.  According to SYED's Medicaid reenrollment application dated April 21, 2018, SYED does not store his patient records electronically.

43.     Since January 5, 1996, SYED has been enrolled as Medicare provider.  According to SYED's Medicare reenrollment application dated April 24, 2019, he indicates that he utilizes paper storage for patient records.

44.     SYED has been subject to two consent orders put into place by the Commissioner of the Connecticut Department of Public Health (CT DPH).

45.     In July 1998, it was alleged that SYED prescribed medications, including controlled substances, for a patient using the name of a different person, and a consent order was issued by the CT DPH.  According to the consent order, SYED did not contest the matter.  SYED was required to pay a civil penalty of $2,000 and his license was placed on probation for a period of two years.  During this period, CT DPH required that SYED's records were subject to monthly reviews by a supervising physician.  In addition, SYED was required to maintain a log of all controlled substance prescriptions that were provided to patients, and SYED was required to attend a course in ethics and pharmacology and had to submit proof of completion to the CT DPH.  SYED agreed to this consent order and signed it on June 30, 1998.

46.     In 2016, SYED entered in a civil settlement agreement arising out of his billing practices.  SYED was accused of "upcoding" services, i.e. submitting medical claims using a higher-paying billing code when services with lower-paying billing codes were actually performed, in connection with the bills he submitted to Medicaid and Medicare.  Specifically, he was accused of billing of psychotherapy services under CPT codes that were reimbursed at a higher fee than what was actually being provided.  Accordingly, SYED received more reimbursement from Medicare and Medicaid than he was entitled to receive.  In May 2016, SYED did not admit to any wrongdoing, but agreed to pay $402,000 in cash to the state and federal governments and forfeit $21,000 in funds that the state withheld during the investigation.

47.     In April 2018, as a result of the civil settlement, CT DPH issued a second consent order. The consent order noted that from the time period of about January 2009 through December 2013, for multiple patients, SYED failed to meet the standard of care in that SYED failed to document a treatment plan, billed insurance for patients he had not seen, billed insurance for medication management for patients to whom he had not prescribed medication, and upcoded billings for fifty minute office visits that were actually substantially shorter and/or failed to document an office visit that supported such coding. SYED's license was placed on probation for a period of one year. During that time, SYED was required obtain a physician supervisor to review SYED's patient records. SYED was also required to attend a course in documentation standards and present proof to the CT DPH that the course was completed.

## PROBABLE CAUSE

### I.     CURRENT INVESTIGATION

48.     In or around 2018, DEA opened an investigation into SYED based on information received through the DEA informational tip line. In or around November 2019, HHS-OIG joined the investigation when it was discovered that some of SYED's patients were utilizing their Medicare or Medicaid insurance to pay for medically unnecessary prescriptions.

49.     Based upon the investigation to date, SYED is alleged to be prescribing large quantities of controlled substances outside the course of normal medical practice, including but not limited to oxycodone, various benzodiazepines, and Adderall, and is known to prescribe these types of medications in dangerous combinations. I believe the controlled substances SYED is prescribing are not medically necessary, are outside the scope of a psychiatrist's usual medical practice and are causing harm to patients and potentially the community. In addition, SYED is alleged to be accepting cash for these prescriptions. Based upon the facts presented in this affidavit, I believe

that SYED has committed criminal offenses including health care fraud in violation of 18 U.S.C. §§ 1347 and 1035 and prescribing a controlled substance without a valid medical reason in violation of 21 U.S.C. § 841.

### A. Cash Payments for Office Visits and Prescriptions

50.     In June 2018, the DEA received a tip from the parent of one of SYED's patients.  The parent stated that his/her child had been a patient of SYED's since January 2018 and was prescribed Suboxone.  The child was charged $140.00 cash for a psychiatric diagnostic evaluation.  The parent reported that he/she had tried to obtain documentation of the patient visit from SYED's office for at least two months without success.

51.     In the fall of 2018, law enforcement received a tip from an individual identified as K.S., who stated his/her parent, T.S., is a patient of SYED's.  K.S. stated that he/she was concerned because he/she believed that T.S. abused his/her prescription of alprazolam from SYED.  K.S. also reported that T.S. paid cash for office visits with SYED.  A review of Medicaid records for office visits for T.S., however, revealed that SYED billed Medicaid for 22 office visits between June 2016 and November 2019 and received approximately $1,049 in Medicaid payments.  Additionally, T.S. used his/her Medicaid insurance to pay for the medications prescribed by SYED.

52.     According to a review of Medicaid claims data and a review of the Connecticut Prescription Monitoring Program ("CT PMP") data, the last prescription that SYED wrote for T.S. was for 120 alprazolam 0.5 mg tabs, equivalent to 2 mg per day of alprazolam.  This prescription was written on October 31, 2019.  SYED's last billed visit with T.S. was on November 1, 2019.  On November 2, 2019, T.S. died of an overdose.  According to a report obtained from the State of Connecticut Office of the Chief Medical Examiner ("CT OCME"), the cause of death was acute

intoxication due to the combined effects of alprazolam and methadone.  The manner of death was listed as an accident (substance use).

53.     In the fall of 2018, law enforcement obtained intelligence from a West Haven Police Department confidential source ("CS-1"), SYED's patient.  CS-1 stated that he/she received prescriptions for alprazolam 2mg pills and Adderall 30mg pills from SYED in exchange for cash. CS-1 stated that he/she would pay SYED in cash for the prescriptions.  CS-1 stated that he/she had been paying SYED cash for prescriptions since approximately 2016.  CS-1 also stated that SYED would bill his/her insurance for the office visit in addition to the cash payments at the time of the visit.

54.     A review of Medicaid claims data revealed that from February 2016 to September 2016, Medicaid paid for prescriptions for CS-1.  Between 2017 and 2020, there were no prescriptions or office visits billed under Medicaid.  Instead, during this time period, according to the CT PMP, it appears that CS-1 was using commercial insurance to pay for prescriptions.  In June of 2020, Medicaid again paid for prescriptions and office visits for CS-1.  Between June 2020 and April 2021, SYED billed Medicaid for nine office visits; Medicaid paid SYED $490.94 for these visits.  From January 2016 to April 2021, Medicaid paid a total of approximately $2,913 for medications prescribed to CS-1 by SYED.

55.     State of Connecticut Prescription Monitoring Program records along with a review of Medicaid claims data confirmed that beginning approximately March 2016 and continuing through June 2021 SYED has prescribed CS-1 alprazolam (1 or 2 mg tabs) and Adderall (20 or 30 mg tabs) every 30 days.  In addition, SYED prescribed CS-1 zolpidem[3], suboxone[4], and carisoprodol[5].

---

[3] Zolpidem is the generic name for Ambien, a sedative hypnotic used to treat insomnia.
[4] Suboxone is the brand name for buprenorphine-nalxone and is used to treat people with opioid addiction.
[5] Carisoprodol is a muscle relaxant.

56.     Based on my training and experience as a registered nurse, I know that combining certain medications that have similar effects is dangerous and increases the risk of accidental overdose.  For example, both alprazolam and zolpidem slow down the central nervous system and have side effects such as drowsiness, dizziness, and respiratory depression.   When these medications are taken together, the side effects are increased which can lead to coma and even death.

**B.  Complaints by Rushford Center Employee**

57.     Between January and February 2019, law enforcement received complaints and information from an employee of the Rushford Center, a recovery-based substance abuse treatment center, regarding a patient of SYED's ("Patient A").  The employee stated that Patient A was possibly over-prescribed medications from SYED and had been admitted to the Rushford Center for rehabilitation four times in the fourteen months prior to February 2019.  According to the employee, SYED had been prescribing Patient A sedatives and Suboxone, and had recently increased Patient A's dose of Suboxone.  The employee stated that when the patient was admitted, the patient denied taking Suboxone.  This was subsequently verified by a urine test, which was negative for Buprenorphine, a chemical in Suboxone.  The employee stated that Rushford has asked the patient why he/she was picking up the prescription if he/she was not taking it and what he/she was doing with them.  The employee stated that the patient could not provide a "clear or sensible answer."  The employee stated that despite being admitted numerous times to the Rushford Center for rehabilitation, SYED has continued to prescribe and increase the quantities of the prescriptions to Patient A.

58.     Prior to notifying law enforcement, on November 27, 2017 and February 2, 2018, Rushford faxed letters to SYED regarding its concerns about the well-being of Patient A and the

potential for misuse and abuse of controlled substances. The letters emphasized that SYED should seek alternatives for Patient A and recommended discontinuing these prescriptions. According to the employee, Rushford staff was seeking support from SYED to help Patient A. In the letters, Rushford asked SYED to "provide [Rushford] in writing a diagnosis to support continuance of the medications [and] confirmation of dosing and administration" if SYED believes that the "indication to continue [the] patient on such medications outweighs the clear potential for misuse/abuse" and the patient should not be detoxified. Rushford never received responses from SYED.

### C. Patient E.R.

59.     In November 2019, law enforcement met with a West Haven Police Department confidential source, ("CS-2"). CS-2 has prior convictions for larceny, drug possession and sale, and burglary. CS-2 was arrested in April 2019 for possession of a controlled substance. After this arrest, CS-2 became an unpaid confidential source. CS-2 has provided credible and reliable information and has conducted successful controlled purchases that has led to arrests.

60.     CS-2 revealed information regarding individuals that he/she knows are patients of SYED and that are selling their prescriptions. One of these individuals is E.R.

61.     According to CS-2, E.R. is a known heroin user and also attends a methadone clinic six days a week.

62.     CS-2 reported that E.R. sells his/her oxycodone, suboxone, and alprazolam prescriptions on the street. Specifically, CS-2 told DEA agents that E.R. sells his/her entire oxycodone prescription from SYED to one individual, S.T.

63.     A query of CT PMP and Medicaid data revealed that since at least January 2016 to at least May 2021, E.R. has been receiving the following prescriptions for controlled substances from SYED each month:

     a.    Oxycodone 30 mg tablets, 90 tablets every 30 days

     b.    Dextroamphetamine-amphetamine (Adderall) 30 mg tablets, 90 tablets every 30 days

     c.    Clonazepam 2 mg tablets, 120 tablets every 30 days

64.     In addition, from May 2017 to November 2018, SYED provided E.R. with a monthly prescription for carisoprodol 350 mg tablets, 90 tablets.  From January 2016 to July 2019, E.R. also received monthly prescriptions for Belsomra[6].

65.     According to Medicaid claims data, E.R. used his/her Medicaid insurance to pay for his/her prescriptions, although SYED did not bill E.R.'s Medicaid insurance for office visits or any other services.

66.     Based on my training and experience, when a provider, such as SYED, enrolls in Medicaid, they agree not to bill clients or any other party for services covered by the Connecticut Medical Assistance Program (Medicaid).  If a patient is a Medicaid beneficiary, the provider should not be charging the patient cash as this violates the Medicaid provider enrollment contract. Therefore, if the services were medically necessary and appropriate, I would expect SYED to bill Medicaid for such services instead of charging the patient cash.  In addition, I know that physicians cannot write prescriptions with refills for schedule II medications, but instead must evaluate the patient at an office visit.[7]  And, I know that when patients are prescribed large quantities of narcotic

---

[6] Belsomra is the brand name for suvorexant, a sedative hypnotic used to treat insomnia.
[7] During the Covid pandemic, refills could be written after a telehealth visit and documentation in the patient's file.

pain medications, a physician's best practice would be to assess the patient in person and determine the ongoing need for the medication every time a new prescription is written.

67.     E.R.'s prescriptions are of particular concern and raise "red flags" for at least three reasons:

    a.    First, based on my training and experience, taking an opioid (oxycodone) at the same time as benzodiazepine (clonazepam) places a patient at a higher risk for an adverse respiratory effect, namely respiratory depression. In my experience, physicians may attempt to offset the adverse respiratory effects by prescribing an "upper," such as dextroamphetamine-amphetamine , believing that this will help prevent the patient from overdosing on the combination of opioids and benzodiazepines. However, this is very dangerous as Adderall, a stimulant, can mask the effects of opioids and benzodiazepines, which have depressant properties, and cause the patient to overdose on these drugs. Indeed, in 2016, the Centers for Disease Control and Prevention (CDC) issued guidelines pertaining to opioid prescribing. In these guidelines, the CDC recommends that whenever possible, physicians should avoid prescribing opioid pain medication along with benzodiazepines. The National Institute for Drug Abuse (NIDA) states that combining opioids and benzodiazepines "can be unsafe because both types of drugs sedate users and suppress breathing…"

    b.    Second, based on my training and experience, the specific combination of an opioid (oxycodone, hydrocodone, or tramadol), a benzodiazepine (clonazepam), and a muscle relaxer (carisoprodol) is known as the "trinity" or the "holy trinity." The "holy trinity" creates an effect similar to morphine and exacerbates potentials for abuse and dependence. The specific combination of a narcotic (oxycodone), a benzodiazepine (clonazepam), a muscle relaxer (carisoprodol), and a sedative (belsomra) is known as the "quaternity." The combinations of the quaternity are the same products as the "trinity" but with an added fourth controlled substance that is in the sedative category and like the trinity, exacerbates the potential for abuse. Based on my training and experience, I know that these combinations of drugs are rarely legitimately prescribed.

    c.    Third, E.R. is filling his/her prescriptions at two pharmacies. Filling prescriptions at multiple pharmacies is considered a red flag and is indicative that a patient may be receiving prescriptions outside of the usual course of professional practice or may be diverting and/or abusing their prescriptions.

68.     On February 7, 2020, agents from the DEA conducted surveillance of E.R. in order to observe E.R. pick up his/her prescription and potentially observe E.R. sell the pills on the street.

69.     At approximately 8:15 a.m., E.R. was observed exiting his/her residence.  E.R. walked down the driveway and waited at the intersection of Fairmont Ave. and Fulton Street.  Soon after, a white four door Cadillac arrived and E.R. entered the front passenger seat.  A Department of Motor Vehicle check on the Cadillac registration revealed a valid registration on a white 2016 Cadillac XTS Platinum registered to S.T.

70.     Agents from the DEA surveilled the Cadillac as it drove to Hancock Pharmacy where E.R. was observed exiting the vehicle and entering the building.  E.R. was then observed entering Hancock Pharmacy inside the building.

71.     The white Cadillac departed the area once E.R. exited the vehicle.  DEA TFOs followed the white Cadillac as it travelled away from Hancock Pharmacy.  Surveillance did not notice anyone else enter or exit the vehicle after dropping off E.R.  The vehicle turned into a Mobile gas station and a DEA TFO observed the operator exit the vehicle.  The operator was a white male, very tall, heavy set with gray hair, and resembled S.T.  The white male went into the Mobile gas station store for a brief period of time and walked back to the vehicle where he entered into the driver seat and subsequently left the area.

72.     The vehicle then traveled back towards the pharmacy.  E.R. was observed leaving the pharmacy.  Moments later surveillance observed the Cadillac pull up to the front of the building where they observed E.R. enter the front passenger seat of the vehicle.  The vehicle then traveled onto Interstate 95 north.

73.     The vehicle exited off Interstate 95 north and surveillance followed the vehicle closely to where E.R.'s residence is located.  DEA agents then observed the Cadillac make an abrupt stop on a hill approximately 100 feet from the intersection of Fulton Street and Fairmont Avenue where E.R. was picked up earlier.  Agents observed the vehicle stop on a hill on a wooded curve in the

road which was an abnormal and unsafe area of the street to abruptly stop.  It was also noted that this side of the road had no vehicles parked on the side, whereas the other side of the street was equipped for street parking.  Through my training and experience, sudden stops on the side of the road in an obscure area is indicative to drug transactions.

74.     After the brief stop, the Cadillac drove back to where E.R. initially waited and dropped E.R. off.  E.R. exited the vehicle and walked toward his/her residence.  Agents from the DEA coordinated with the New Haven Police Department to conduct a traffic stop of the Cadillac to confirm the individual driving was in fact S.T. and to assess if a drug transaction did indeed occur.

75.     During the traffic stop, evidence was seized from S.T. by New Haven Police Department.  Evidence included one small, white container, containing 36 small, round blue pills stamped "m" on one side "30" on the other, which were suspected to be oxycodone 30 mg pills.  In addition, also seized was one orange prescription bottle from Hancock Pharmacy with E.R.'s information on the label containing 89.5 small, round blue pills stamped "A 51" on one side, also suspected to be oxycodone 30 mg pills.  DEA received this evidence and sent it to a lab for testing, which revealed that the pills were indeed oxycodone 30 mg tabs.

76.     A review of the CT PMP revealed that on February 7, 2020, SYED provided E.R. with a prescription for 90 oxycodone 30 mg tabs and 90 Adderall 30 mg tabs which were filled by E.R. on the same date at Hancock Pharmacy.

77.     On March 6, 2020, agents from the DEA conducted an interview of E.R. at his/her residence.

78.     During the interview, E.R. told agents that he/she has been going to see SYED for approximately 20 years beginning after he/she was in a car accident.  E.R. originally began seeing SYED due to post traumatic stress disorder (PTSD) and depression and went to him to obtain

antidepressants. For approximately the past eight years E.R. has also been receiving oxycodone from SYED. E.R. told investigators that he/she also has been diagnosed with cancer but was not under the care of a pain management physician. SYED is aware of E.R.'s cancer diagnosis.

79.     As described above E.R., E.R. sees SYED once a month and receives 30-day prescriptions for 90 clonazepam 2 mg tablets, 90 oxycodone 30 mg tablets, and 90 Adderall 30 mg tablets. E.R. told DEA agents that he/she does not consume the oxycodone or Adderall pills prescribed by SYED and told agents that he/she had been selling his/her oxycodone prescription to S.T. for several years. E.R. told agents he/she told SYED he/she attends a methadone clinic. E.R. also believes that SYED knows he/she uses heroin. SYED has never asked E.R. to provide a urine drug screen or toxicology test.

80.     E.R. said that during his/her office visits, SYED and E.R. talk for a few minutes and then SYED provides E.R. with his/her prescriptions. According to E.R., SYED does not have a computer and takes handwritten notes. E.R. told agents he/she believes SYED had a paper file at the practice. E.R. also stated that he/she has observed patients talking in the waiting room about what pills they are getting from SYED and they often talk about swapping or selling pills to each other. E.R. stated that sometimes the receptionist will put a stop to those types of conversations but not always. E.R. stated that over the years he/she has witnessed patients selling their pills in the parking lot outside of the practice.

**D. Patient H.S.**

81.     CS-2 also provided information about another SYED patient, H.S. CS-2 stated that H.S. sells clonazepam and alprazolam on the street, allegedly selling his/her alprazolam 2 mg tablets for $8.00 each. Based on my investigation, I believe that the clonazepam and alprazolam H.S. sells on the street is from prescriptions that he/she and others he/she knows get from SYED.

82.     According to a review of Medicaid claims data and the CT PMP, between January 2016 and January 2018, H.S. received monthly prescriptions for 120 alprazolam 2 mg tabs.  Between January 2018 to May 2021, H.S. received monthly prescriptions for 90 alprazolam 2 mg tabs.

83.     On November 8, 2019, members of the DEA utilized CS-2 to purchase a quantity of alprazolam from H.S.

84.     Prior to the meeting with H.S., a Task Force Officer (TFO) and Special Agent from the DEA met with CS-2 at an agreed briefing meet location and provided him/her with $80.00 in DEA serialized money to purchase the drugs from H.S.  Under the direction of the investigators, CS-2 contacted H.S. via cell phone.  CS-2 made contact with H.S. who stated he/she was good and to meet him at the "Coffee Shop."  CS-2 stated "Coffee Shop" meant a Dunkin Donuts parking lot located in New Haven.

85.     Shortly after the communication, CS-2 was observed driving to the meet location where H.S. was observed by surveillance in a silver Chevrolet Malibu.  CS-2 entered the front passenger seat of the vehicle and conducted the transaction, in which, as I later learned from CS-2, CS-2 paid H.S. $80 in exchange for 10 alprazolam pills.

86.     Once the transaction was complete CS-2 was observed exiting the silver Chevrolet Malibu and entering back into the driver seat of his/her vehicle.  CS-2 was observed as he/she drove to the agreed debriefing location.

87.     At the debriefing location, CS-2 provided agents from the DEA with 10 white, rectangular pills stamped "G3722" on one side, which based on training and experience is known to be the generic alprazolam.

88.     On April 13, 2021, H.S. was arrested on a Connecticut state warrant for selling controlled substances including alprazolam.  DEA agents subsequently interviewed H.S. who

stated that SYED had been his/her doctor since 2000, when he/she was referred to SYED for mental health issues.  H.S. stated that he/she was prescribed 90 alprazolam 2mg tablets per month from SYED.  H.S. stated that he/she is also on Methadone 80mg per day from a program in New Haven.  H.S. stated that he/she told SYED that he/she was on methadone; SYED never requested a urine screen.  H.S. stated that he/she pays $30 cash to SYED for each appointment and believes that SYED bills H.S.'s Medicaid insurance for the remaining portion of the office visit.[8]  H.S. insisted that he/she never sold prescription pills to anyone.

### E. Patient CS-2

89.    On February 15, 2020, CS-2 had an initial office visit with SYED.  CS-2 was debriefed by investigators after the visit.  CS-2 stated that during the visit, CS-2 explained to SYED he/she has anxiety issues and hadn't slept in days.  CS-2 told SYED that he/she had previously been prescribed benzodiazepines after assisting emergency workers after September 11.  CS-2 told SYED that he/she hadn't seen a doctor in years for anxiety and had been purchasing Klonopin and Xanax on the street, and that he/she had overdosed in the past on Fentanyl and fraudulent pills.  According to CS-2, SYED was not bothered that CS-2 had been purchasing pills on the street or that CS-2 had been using Fentanyl.  CS-2 told investigators that SYED asked very few questions and that he/she had provided the above information without solicitation from SYED.

90.    According to CS-2, when CS-2 asked SYED for Xanax, SYED told CS-2 that the DEA was cracking down on Xanax prescribing and that SYED would only prescribe CS-2 Klonopin.  SYED wrote a prescription for 45 clonazepam 1 mg tablets for 15 days with one refill, effectively 30 days total.  SYED then scheduled CS-2 for another appointment for February 29, 2020, approximately two weeks later.  CS-2 told investigators that he/she kept trying to talk to SYED

---

[8] A review of Medicaid claims data revealed that SYED did not bill Medicaid for office visits.

about his/her issues with anxiety, but SYED stopped CS-2 and told him/her to put the prescription in his/her pocket before SYED changed his mind.  According to CS-2, CS-2 gave SYED $150.00 for the visit and prescription, and SYED gave CS-2 $25.00 in change because SYED said he liked CS-2.  CS-2 stated that the entire meeting with SYED lasted about ten minutes and CS-2 did not have to fill out any paperwork prior to or during the visit.  In addition, CS-2 did not see any computers within the office and did not notice SYED take notes during the visit.

91. On February 29, 2020 a consensual monitoring operation was conducted.  The operation involved CS-2 visiting SYED for his/her previously scheduled appointment. Agents provided CS-2 with $300 of DEA serialized money in anticipation of CS-2 receiving a prescription for alprazolam and an additional $150 to cover the office visit.  CS-2 was also equipped with electronic audio and video recording and monitoring device to ensure the safety of CS2 and to document the meeting.

92. Based on my review of the recording, the following is a description of the office visit. CS-2 asked SYED to change his/her prescription from Klonopin to Xanax.  SYED told CS-2 he couldn't give him/her Xanax unless CS-2 brought in an old prescription bottle to prove that he/she had received Xanax from a different provider in the past.  SYED also said CS-2 could ask the pharmacy for a copy of an old prescription to prove CS-2 had previously been prescribed Xanax. CS-2 told SYED that he/she received prescriptions for Xanax in the past but was currently buying Xanax on the street.  Throughout the visit CS-2 continued to request a prescription for Xanax. SYED then told CS-2 that the DEA sometimes sends fake patients into doctors' offices to try to obtain prescriptions for cash.  SYED told CS-2 that times are different now and that he would give CS-2 a prescription for Xanax "if he could."  SYED reiterated several times throughout the visit

that if CS-2 could show that he/she had previously received a prescription from another physician, SYED would give CS-2 a new prescription for Xanax.

93. Based on my review of the recording, it appears that during the visit SYED did not conduct any verbal or physical medical assessment or ask any questions regarding CS-2's mental health and wellbeing.  SYED did not ask CS-2 if he/she was having any issues with the clonazepam that was previously prescribed, how often CS-2 was taking the medication, or if the medication was effective for CS-2.  CS-2 again told SYED that he/she assisted with cleanup in New York City after September 11, 2001.  SYED only asked what CS-2's job was and if he/she was a firefighter. CS-2 replied that he/she was an iron worker and helped at Ground Zero, and because of this he/she had some breathing issues from the debris.  SYED did not ask how working at Ground Zero made CS-2 feel, if he/she had mental health issues due to being at Ground Zero, and did not inquire further about his/her breathing issues.  In addition, CS-2 again told SYED that he/she has been buying pills on the street and that he/she doesn't like doing that because CS-2 doesn't know what is in those pills.  SYED agreed with CS-2 regarding the dangers of not knowing what is in the pills.

94. SYED could not remember what he prescribed to CS-2 during the prior visit.  CS-2 told SYED that he wrote for 45 Klonopin for 15 days but did not mention the refill.  SYED then wrote CS-2 a prescription for 45 clonazepam 1 mg tablets for 15 days.  SYED did not remember the refill on the previous prescription.  CS-2's new prescription overlapped with the refill of the first prescription, potentially facilitating the diversion of the controlled substance because CS-2 could be in possession of more drug than medically necessary, if he filled both the refill and this new prescription.  In other words, CS-2 could have filled a total of 90 clonazepam 1 mg tablets in one day, kept the quantity of pills that he/she needed and potentially sold the rest on the street.

There was also a risk that CS-2 could take more medication than prescribed which could potentially lead to an overdose.

95. Throughout the visit SYED is seen opening a manila folder and looking through some papers, which is presumably CS-2's patient file. SYED is also seen writing on a piece of paper from this folder. Also noted on the desk is a black rectangular briefcase, a prescription pad, and a notebook labeled "2020 Appointments."

96. Based on my training and experience, I know that clonazepam, a benzodiazepine, can significantly affect a patient's breathing by depressing the respiratory system especially if the medication is mixed with other drugs, such as opioids or other benzodiazepines, or alcohol. In my experience, when physicians prescribe benzodiazepines, they generally assess the patient's mental status and need for these types of medications. In addition, physicians are responsible for providing patient education and warning them about the dangers of mixing medications such as benzodiazepines with other medications. During CS-2's office visits on February 15 and February 29, 2020, CS-2 told SYED that he/she was obtaining drugs such as Xanax on the street and that he/she had previously overdosed on fentanyl. Despite this, SYED provided no education or warning to CS-2 and did not require CS2 to provide a urine sample to ensure that there were no illicit drugs in CS-2's system. I know based on my training and experience that when physicians prescribe controlled substances it is best practice to obtain urine drug screen tests to detect if a patient has illicit drugs, or to ensure that the patient is indeed taking their prescribed drugs. In addition, SYED did not educate CS-2 on the risk of respiratory issues especially given that he/she already told SYED that he/she had breathing problems after September 11.[9]

---

[9] Following the visit on February 29, 2020, CS-2 had another office visit with SYED where he received a prescription for 60 clonazepam 2 mg tabs. This visit was not under the direction of the DEA. When DEA agents discovered that CS-2 had received this prescription, they arranged for CS-2 to turn over the medication, which he/she did. CS-2 is still SYED's patient.

**F.  Consensual Monitoring of Patient CS-3**

*__March 18, 2020 consensual monitoring__*

97. On March 18, 2020, DEA conducted a consensual monitoring operation of an initial patient visit between CS-3 and SYED.  CS-3 has prior convictions for drug possession and sale. CS-3 has provided credible and reliable information and has conducted successful controlled purchase in other Federal cases.  CS-3 has not been paid and is working the case for consideration.

98. The office visit was conducted at 72 North Main Street, Danbury, SYED's former Danbury office, however this location closed.  Prior to CS-3's visit, agents provided CS-3 with $300 of DEA serialized money in anticipation of CS-3 receiving a prescription for alprazolam and an additional $150 to pay SYED for the office visit.  CS-3 was also equipped with electronic audio and video recording and monitoring device to ensure the safety of CS-3 and to document the meeting.

99. Upon review of the recording, this affiant noted that SYED asked CS-3 several questions regarding his/her medical history and if he/she had received treatment or been under the care of a physician in the past.  CS-3 told SYED that he/she used to see a different psychiatrist who provided him/her with alprazolam and CS-3 gave SYED a copy of the old prescription to show that he/she had been on alprazolam in the past.  SYED asked why CS-3 stopped seeing the other psychiatrist, to which CS-3 replied that it wasn't working out because CS-3 wanted to increase his/her dose of alprazolam due to the lower dose not having the same effects as it once had.  CS-3 told SYED that the other psychiatrist was "too afraid" to increase the alprazolam dose for CS-3 so he/she stopped seeing the physician.

100.    SYED then asked CS-3 what symptoms he/she was experiencing on a day to day basis.  CS-3 was evasive in his/her answer, telling SYED that the medication that his/her old

psychiatrist provided made him/her feel better.  SYED then listed symptoms, asking CS-3 if he/she had things such as palpitations, shortness of breath, cramps, numbness, and tingling.  CS-3 replied that he/she has had shortness of breath but hasn't had any panic attacks or anxiety attacks recently. SYED then reviewed a battery of other symptoms and asked CS-3 if he/she was experiencing any of these.  SYED asked about symptoms such as numbness in the feet, tiredness, muscle soreness, to which CS-3 replied that he/she does manual labor and therefore he/she is often sore or has muscle tension due to his/her line of work.   When SYED asked CS-3 about mental health symptoms such as depression, hopelessness, helplessness, tiredness, and again anxiety attacks, CS-3 denied all of these symptoms and said, "I'm fine."  CS-3 told SYED that the main symptom was that he/she sometimes cannot "catch a breath" and has shortness of breath, which the alprazolam has helped with in the past.  Upon review of the video it appeared as though SYED was reading from a list of questions and checking off boxes on a piece of paper.

101.    Upon review of the video, a black rectangular briefcase, like the one seen in the video recording of the visit with CS-2 (*see* paragraph 96), is seen on the desk in SYED's office.

102.    SYED asked CS-3 if he/she had tried any other medications in the past, to which CS-3 replied that he/she was prescribed lorazepam[10] and then clonazepam, prior to receiving prescriptions for alprazolam.  CS-3 told SYED that the lorazepam and clonazepam did not work fast enough.  In addition, CS-3 told SYED that the alprazolam dose he/she was receiving from his/her former psychiatrist was not enough and therefore he/she bought alprazolam on the street to supplement the prescription.  SYED did not appear to react to this comment and simply asked CS-3 if the previous psychiatrist was "friendly."  SYED then asked CS-3 what he can do for him/her.  CS-3 says that he/she is hoping SYED could "help out" with the alprazolam.

---

[10] Lorazepam is another benzodiazepine. The brand name for lorazepam is Ativan.

103.    CS-3 and SYED discussed how New York City is the Xanax capitol of the United States and that everyone in New York City is taking Xanax.  SYED then commented on the ethnicity of CS-3's name and asked if he/she had recently traveled to his/her native country.  SYED wrote CS-3 a prescription for 42 alprazolam 1 mg tablets, to be taken twice a day for 21 days.  CS-3 told SYED that it would be nice if he could give him/her a higher prescription of alprazolam to start, to which SYED said that there are protocols and if CS-3 was talking to SYED five years ago, SYED would have been "talking differently."  At the end of the visit, CS-3 paid SYED $150.00 cash, which was the cost of the initial appointment according to SYED's secretary, S.K. who scheduled the visit for CS-3.

104.    After the visit, CS-3 provided agents from the DEA with the remaining $150.00 of DEA serialized money and the handwritten prescription for the alprazolam.

### *April 6, 2020 Phone Call with SYED*

105.    On April 6, 2020, under the direction of agents from the DEA, CS-3 contacted SYED's office to inquire about his/her upcoming appointment on April 8, 2020.  CS-3 spoke with SYED's secretary S.K.  S.K. told CS-3 that SYED was cancelling the April 8 appointment due to his new office not being operational yet.

106.    Later that day, SYED contacted CS-3 and CS-3 recorded this call with SYED.  I have reviewed the recording.  During the call, SYED told CS-3 that he would provide him/her with a prescription over the phone because the appointment was cancelled.  SYED told CS-3 that he didn't know what medication or dosage CS-3 was on.  CS-3 reminded SYED that the prescription was for alprazolam 1 mg twice a day.  SYED told CS-3 to call his secretary, S.K., and give her the information about the prescription because she would be the one calling the pharmacy.

107.    On April 8, 2020, CS-3 received a call from S.K. who told CS-3 that she had spoken to SYED and that she would be calling in a prescription for CS-3.  She told CS-3 that she did not know what medication or dosage CS-3 was taking.  CS-3 informed her that CS-3 had received a prescription for alprazolam 1 mg tablets twice a day.  She called the prescription into the pharmacy for CS-3.

108.    On April 13, 2020, CS-3 met with DEA agents to pick up the prescription. Prior to CS-3 picking up the prescription, his/her person and vehicle were searched for contraband yielding negative results.  CS-3 was provided $100.00 in DEA serialized money to pay for the prescription.  CS-3 was instructed to use the drive thru to pick up the prescription to limit the CS's exposure and practice social distancing.  DEA agents observed CS-3 use the drive thru at the pharmacy to pick up his/her prescription of 60 alprazolam 1 mg tablets.  After picking up the prescription, DEA agents took custody of the prescription and entered it into evidence.

### *May 13, 2020 Phone Call with SYED*

109.    According to CS-3, on May 7, 2020, CS-3 contacted S.K. regarding obtaining a refill of his/her medication from SYED.  CS-3 spoke with S.K. and asked if his/her dosage could be increased to alprazolam 2 mg tabs two times a day.  S.K. told CS-3 that SYED would not increase his/her prescription over the phone and needed to see CS-3 in person.  CS-3 told S.K. that he/she didn't want to go into the office due to the coronavirus because his/her mother was a high risk.  S.K. told CS-3 that he/she would still need to come in and CS-3 requested that SYED call him/her.

110.    According to CS-3, on May 13, 2020, SYED called CS-3.  During this call, CS-3 asked SYED to increase his/her alprazolam prescription to 2 mg tablets twice per day.  CS-3 stated that SYED told him/her that it was a scheduled drug and that he couldn't prescribe the 2 mg tablets.

CS-3 then asked SYED if he/she could get an additional prescription for clonazepam in addition to the original alprazolam 1 mg prescription. SYED told CS-3 that he could not prescribe two benzodiazepines. CS-3 then asked SYED if he/she could increase his/her prescription from 1 mg tablets twice per day to 1 mg tablets three times per day (equaling 3 mg of alprazolam per day) which SYED agreed to, despite not asking CS-3 any questions regarding why the increase in medication was necessary. SYED requested CS-3's pharmacy information and stated that he would call in the prescription with the increased dosage. CS-3 subsequently picked up the prescription on June 2, 2020. DEA took custody of the prescription of 30 alprazolam 1 mg tablets and entered it into evidence.

### *June 10, 2020 Consensual Monitoring*

111.    On June 10, 2020, a second consensual monitoring operation was conducted between CS-3 and SYED. Prior to CS-3's visit with SYED, agents provided CS-3 with $450 of DEA serialized money in anticipation of CS-3 receiving an additional prescription for alprazolam and to cover the previous prescriptions that were phoned into the pharmacy for CS-3 on April 8, 2020 and May 13, 2020. CS-3 was also equipped with electronic audio and video recording and monitoring device to ensure the safety of CS-3 and to document the meeting.

112.    Upon review of the recording, this affiant noted the following. At the beginning of the visit, a black rectangular briefcase was on SYED's desk. SYED opened the briefcase seemingly to look for something but did not take anything out. SYED then opened a desk drawer and pulled out a prescription pad. In addition, two manila folders were on SYED's desk along with a pile of papers. Also on his desk was a brown notebook that appeared to be similar to the appointment book described in paragraph 96.

113.     CS-3 told SYED that the prescription he called in on May 13, 2020 was incorrect. As noted above, SYED agreed to increase CS-3's alprazolam to 1 mg three times per day. However, when CS-3 picked up the prescription, the dose remained the same as the previous prescription, 1 mg twice per day.  CS-3 told SYED that because the prescription was wrong, he/she supplemented his/her supply with alprazolam pills he/she got from a friend.  CS-3 told SYED that he/she now owes the friend and has to give him/her alprazolam pills back from CS-3's prescription. SYED does not respond to CS-3's admission that he/she took pills from a friend and now has to give some of his/her pills back to the friend.  Instead SYED told CS-3 that he is going to make sure that CS-3 gets the correct prescription for alprazolam 1 mg tabs three times per day.  CS-3 also asked SYED if he could give CS-3 alprazolam 2 mg tablets.  SYED told CS-3 that he has to go slow with increasing the dose because of the DEA, but that CS-3 would get the alprazolam 2 mg tablets in time.

114.     Upon review of the recording, this affiant noted that SYED did not ask any medical questions regarding CS-3's anxiety or use of the alprazolam.  SYED asked CS-3 about where he/she was working and if he/she was going to visit his/her native country.  CS-3 told SYED that he/she was on lunch break and therefore couldn't stay long.  Despite not conducting any type of verbal or mental health assessment, SYED can be seen writing something on a piece of paper he took out of a manila folder presumably CS-3's medical file.

115.     At the end of the visit CS-3 asked SYED what CS-3 owed him, to which SYED asked CS-3 what he/she paid last time.  CS-3 said that he/she couldn't remember, and SYED asked CS-3 if $75.00 was ok.  CS-3 said yes but he/she would need change.  SYED told CS-3 that he/she could pay more if he/she wanted, and CS-3 told SYED if SYED prescribed more medication, he/she would.  SYED replied, "don't you think I want to?"  SYED handed CS-3 a prescription for

90 alprazolam 1 mg tabs for 30 days, and CS-3 handed SYED the money.  SYED took the money and retrieved change for CS-3 out of his left-hand desk drawer.  CS-3 left the office and met with DEA agents who took custody of the rest of the DEA serialized money and the paper prescription for 90 alprazolam 1 mg tablets for a 30-day supply.

116.    Based on my training and experience as a registered nurse and an HHS-OIG agent, when a physician increases a medication, especially a controlled substance, there must be a reason behind doing so, other than the patient requesting it.  Physicians must conduct assessments to be able to make a medical determination for the need to increase medications.  In order for SYED to increase CS-3's alprazolam prescription to 3 mg per day, I would expect that he should have, at the very least, asked CS-3 questions regarding the effectiveness of the medication, CS-3's anxiety levels since starting the medication, and how CS-3 is tolerating the medication, as alprazolam can have such effects as drowsiness, fatigue, dizziness, and sedation.  During this visit, SYED did not ask CS-3 any questions regarding his/her mental health, and yet SYED increased CS-3's alprazolam to 3 mg per day.

117.    On June 26, 2020, under the direction of agents from the DEA, CS-3 filled the alprazolam prescription received from SYED on June 10, 2020.  Once filled, DEA took custody of the pills and placed them into evidence.

**G. Concerns of Addiction Medicine Physicians**

118.    On April 23, 2020, investigators from the DEA and HHS-OIG spoke with physicians from the Addiction Medicine Program located at Yale New Haven Hospital.  These physicians had previously contacted the U.S. Attorney's Office with concerns regarding SYED's prescribing.

119.    Since starting work at the program in 2018, Physician Witness #1 noticed a concerning pattern with regard to patients of SYED. Physician Witness #1 told investigators that several of the patients he/she saw in the program were prescribed prescriptions by SYED that included high doses of benzodiazepines, and which Physician Witness #1 believed were outside the standard of care.

120.    In describing the program, Physician Witness #1 stated that when patients are hospitalized at Yale for complications related to drug or alcohol abuse, Physician Witness #1 or other doctors from the program may be called on to aid in the patients' substance abuse issues. As part of their work, these doctors or their staff will often reach out to the patient's regular physicians to make recommendations and discuss the patient's continued plan of care. Physician Witness #2 stated that coordination between providers leads to better outcomes for the patients.

121.    With respect to the SYED's patients, according to Physician Witness #1, he/she and his/her staff tried numerous times to reach out to SYED when his patients are hospitalized but have never been able to reach him. Physician Witness #1 estimated that between five and fifteen of SYED's patients have been hospitalized for addiction and not once has Physician Witness #1 or the team been able to reach SYED. Physician Witness #1 has also sent letters and information to SYED's office with no reply.

122.    Physician Witness #1 stated that he/she contacted authorities because between November 2019 and April 2020, there were two especially concerning patients of SYED (Patient #1 and Patient #2) who overdosed and were admitted to Yale New Haven Hospital. Both patients had been hospitalized in the past for overdoses, and both had unintentional overdoses of benzodiazepines between November 2019 and April 2020. One of the patients was also on

methadone treatment but was still prescribed high doses of benzodiazepines by SYED. One of the patients had two near fatal overdoses, and one of the patients had three near fatal overdoses.

123.   According to Physician Witness #1, Patient #1 had overdoses on February 17, March 16, and April 15, 2020. According to Physician Witness #1, the overdose that occurred on April 15 was a near-fatal. SYED prescribed mostly alprazolam, zolpidem, and methylphenidate[11] to this patient.

124.   Patient #2 had overdoses on November 14, 2019 and March 2, 2020. SYED prescribed the same medications (alprazolam, zolpidem, and methylphenidate) to Patient #2. Both alprazolam and zolpidem slow down the central nervous system and have side effects such as drowsiness, dizziness, and respiratory depression. When these medications are taken together, the side effects are increased which can lead to coma and even death. Combining stimulants and sedatives can lead to taking too much of one type of drug. Because stimulants overshadow the effects of depressants, a person may not feel the depressant's effects and think they need to take more which can potentially lead to overdose. Mixing amphetamines with sedatives may give users a sense of euphoria before an overdose. Taking both types of drugs at once is also potentially damaging to the cardiovascular system, as stimulants increase heart rate, while depressants work to slow it. This may result in dysrhythmias or heart failure.

125.   Physician Witness #1 also stated that there are some patients who have reported that they are able to get in touch with SYED directly and they will meet up with him outside of the office at places like Dunkin Donuts. Patients also reported to Physician Witness #1 that they paid cash for their appointments with SYED.

---

[11] Methylphenidate is a Schedule II central nervous system stimulant that is used to treat attention deficit hyperactivity disorder (ADHD).

126.     Physician Witness #1 stated that based on the number of patients admitted to Yale New Haven Hospital Addiction Medicine services and the number of SYED's patients that have overdosed he/she believed SYED's prescribing practices fall outside the standard of care.

127.     Physician Witness #2 has been working at Yale New Haven Hospital since 1991 and has been aware of SYED's prescribing practices since then.  Physician Witness #2 has reported SYED to the Connecticut State Medical Board.  Physician Witness #2 stated that there are several providers in the hospital and in the community that are aware of the harmful prescribing practices of SYED.

128.     On June 10, 2021, investigators from the DEA and HHS-OIG spoke with Physician Witness #1 and #2 again.  Physician #2 stated that within the past month there have been three SYED patients that he/she was concerned about, including an overdose death of one of the patients he/she spoke about in the prior interview.

129.     Physician Witness #2 described a third patient ("Patient #3").  According to Physician Witness #2, Patient #3 was a high-risk patient for potentially diverting his/her medications that were prescribed by SYED.  Patient #3 was admitted to the hospital for osteomyelitis[12] of the spine, related to his/her intravenous drug use.  When Patient #3 was first admitted to the hospital, he/she was asked questions about his/her prescription medication.  Patient #3 denied taking medications.

130.     A review of the CT PMP database revealed, however, that Patient #3 was prescribed several medications by SYED including buprenorphine, alprazolam, temazepam, and Adderall. Patient #3 was also prescribed two expensive medications: (i) Trintellix, an antidepressant; and (ii) Vraylar, an antipsychotic.

---

[12] Osteomyelitis is an infection of the bone caused by bacteria or fungi.

131.    After learning this information, Physician Witness #2 asked Patient #3 about the prescriptions and asked why Patient #3 did not disclose them.  Patient #3 told Physician Witness #2 that he/she was prescribed the first four medications by SYED.  Patient #3 stated that he/she does not take the buprenorphine, but instead keeps it in a safe at his/her home.  Patient #3 claimed that he/she has about 500 buprenorphine pills currently stored in the safe.  Patient #3 also stated that he/she takes only about one-quarter of the alprazolam pills and that SYED is aware of this, but told Patient #3 to keep the current prescription because it was good to have them on hand if Patient #3 needed more.  Patient #3 also admitted to taking Adderall occasionally.  Finally, Patient #3 stated the he/she does not know what Trintellix and Vraylar are and that he/she does not take those medications.

**H. Interview of SOI-1**

132.    On October 22, 2020, investigators interviewed a local pharmacist familiar with the prescribing practices of SYED (Source of Information or "SOI-1").

133.    SOS-1 told investigators that he/she sees a lot of prescriptions issued by SYED that present numerous "red flags," including patients receiving the maximum dose of a stimulant, patients getting too much medication too soon, and patients exhibiting drug seeking behavior such as getting belligerent when they can't fill their prescriptions early, and patients paying cash.  SOS-1 gave an example of Patient #5, one of SYED's patients.  In June or July of 2018, Patient #5 came in with a prescription but had paid cash for the same prescription at another pharmacy 12 days prior.  SOI-1 tried to reach SYED to obtain an explanation but was unable to.  In general, SOI-1 said that SYED is "impossible to get ahold of."

134.    A review of Patient #5's confidential prescribing history indicates that during June and July of 2018, SYED prescribed Patient #5 90 alprazolam 2 mg tablets three times per day (6

mg per day), 90 methylphenidate 20 mg tablets three times per day (60 mg per day), and 60 triazolam[13] 0.25 mg tablets two times per day (0.5 mg per day).  Of note, alprazolam and triazolam are both benzodiazepines.

135.   According to a review of the CT PMP data SYED has continued to prescribe Patient #5 the same doses of alprazolam and methylphenidate.  SYED no longer prescribes Patient #5 triazolam; instead he prescribes him/her 30 milligrams of temazepam per day and 10 milligrams of diazepam per day.  Alprazolam, temazepam, and diazepam are all benzodiazepines.  Based on my training and experience, I know that combining different benzodiazepines is dangerous and causes the effects of the medications to be greatly increased.  Such effects that the medication can cause include extreme sleepiness, respiratory depression, coma, and even death.

136.   SOI-1 has tried to call SYED several times for questions regarding patients starting dosages or dosage increases.  When SOI-1 leaves a message, it is often SYED's secretary that returns the call.  SOI-1 has managed to successfully speak to SYED a few times and recalls that one of the reasons SYED would justify a high starting dose was because the "recommended starting dose doesn't work."

137.   SOI-1 recalled an instance where a patient was walking around the pharmacy asking for change for $100 so that he could pay for his doctor's visit.  SOI-1 noted that the patient later returned to the pharmacy with a prescription from SYED, which SOI-1 refused to fill.  SOI-1 also felt that the turnaround was too fast, meaning that the time from when the patient left the pharmacy to when he returned with a prescription was just too short to have received a bona fide office visit.  Rather, according to SOI-1, the patient likely went to SYED's, paid the cash, and received his prescription.

---

[13] Triazolam is a benzodiazepine medication often used to treat insomnia.

138.   SOI-1 also explained that SYED usually prescribes only immediate release Adderall (dextroamphetamine-amphetamine) and Ritalin (methylphenidate).  SOI-1 believes that this is a red flag because these medications, which are for ADHD, are normally prescribed with an extended release version of the medication to keep symptoms under control.  SOS-1 noted that most practitioners typically provide patients with ADHD with an extended release medication and not only immediate release[14] medications.

**I.   Interview of SOI-2**

139.   On October 22, 2020, DEA investigators interviewed SOI-2, another local pharmacist familiar with the prescribing practices of SYED.

140.   SOI-2 expressed that he/she had concerns about SYED's prescribing of certain medication combinations and that as a psychiatrist, by prescribing oxycodone and amphetamines, SYED practices outside of the standard of care.  SOI-2 felt many of SYED's patients exhibited "red flags."  SOI-2 mentioned two patients specifically, E.R. (discussed in paragraphs 59 through 79) and J.K., that he/she refused to fill medications for due to the dangerous combination of medications they were receiving from SYED.

141.   SOI-2 told investigators that he/she would leave messages for SYED, but SYED would rarely, if ever, return any calls.  On the rare occasion that SOI-2 did speak with SYED, SYED would tell SOI-2 to give patients "the usual" but did not provide specifics on what the prescription should be.

---

[14] Extended release medications are designed to slowly release a drug in the body over an extended period of time which reduces dosing frequency.  Immediate release medications dissolve quickly, and patients experience the effects of these medications more quickly. In addition, immediate release medications wear off more quickly than extended release, and therefore require increased dosing frequency.

**J.  Interview of K.H.**

142.    On January 11, 2021, agents from DEA and HHS-OIG interviewed K.H., the parent of N.M., a former patient of SYED.  K.H. contacted investigators because N.M. suffered from addiction and committed suicide in December 2018.

143.    According to K.H., in or around February 2018, N.M. became SYED's patient.  In January 2018, N.M. was arrested on disorderly conduct and third-degree assault charges.  After his/her arrest, the Connecticut Department of Social Services (DSS) and the Connecticut Department of Child and Family Services (DCF) became involved and required N.M. to receive psychotherapy and treatment for his/her drug addiction.  N.M. learned about SYED from a friend who was also a patient and was also required to receive psychotherapy and addiction treatment after an arrest.

144.    According to K.H., N.M. paid cash for all appointments with SYED and N.M. would use his/her CT Medicaid insurance to pay for the prescriptions.  N.M. paid SYED $60.00 every two weeks and received Subutex (buprenorphine only) from SYED because N.M. told SYED that he/she was allergic to regular Suboxone (which is a combination of buprenorphine and naloxone).  K.H. did not believe N.M. was allergic to Suboxone.  Based on my training and experience I know that Subutex, while effective in the treatment of opioid addiction, is still a highly abused drug and patients with a history of addiction may seek to inject the drug intravenously, or abuse the drug in other ways, in order to obtain a high.

145.    According to K.H., N.M. told K.H. that SYED required urine drug tests to be conducted.  K.H. did not believe N.M. because K.H. knew that N.M. would sometimes obtain Suboxone illegally (without a prescription) and also used crack and heroin while he/she was a

patient of SYED. Therefore, if SYED did require urine drug tests to be done, he would have known that N.M. was using illicit drugs.

146.    Post his arrest, N.M. was required to produce medical records for the CT Department of Child and Family Services to prove that he/she was receiving psychotherapy and addiction treatment. K.H. along with N.M.'s attorney both made several attempts to contact SYED to request N.M.'s medical records without success. The only document SYED produced was a handwritten note stating that N.M. was under the care of SYED and attends appointments regularly. SYED never produced medical records for N.M. as requested.

147.    In or around June or July of 2018, N.M. moved to South Carolina. N.M. asked K.H. to pick up his/her prescription for Subutex from SYED as he/she was out of state. K.H. agreed to pick up N.M.'s prescription. When K.H. went to SYED's Glastonbury office (since closed), K.H. told SYED that he/she was there to pick up a prescription for his/her child. SYED did not ask for any identification or for any information about the patient and simply provided K.H. with the prescription in exchange for the $60.00 cash.

**K.  Red Flags Regarding Syed's Prescribing Practices**

148.    Based on my training and experience as a registered nurse and an HHS-OIG Special Agent, I am aware of "red flags" that indicate that a doctor may be prescribing controlled substances without a legitimate medical purpose and outside the usual course of professional practice. The "red flag" behaviors often suggest both drug diversion and health care fraud violations.

149.    With regard to health care fraud "red flags," indicia can include: prescribing medically unnecessary medication, or spending only a few minutes with a patient and providing

him/her with a prescription for controlled substance without conducting a physical or mental health examination.

150.   Some of these "red flags" that indicate drug diversion include the following: (a) brief, cursory medical examinations, or in some cases, none at all; (b) prescribing multiple drugs within the same category (e.g., prescriptions for more than one typo of benzodiazepine); (c) elevating the dose of a controlled substance or changing the prescription from a weaker controlled substance to a stronger controlled substance without a legitimate medical need; (d) a lack of diagnostic testing, including urine drug screens, to assess for presence of the prescribed drug and/or the presence of illegal drugs in the urine; (e) failing to heed warnings about patients by others (including insurance companies, pharmacists, family members, and doctors); (f) ignoring the condition, physical appearance, or behavior of patients, which would create suspicion of drug addiction in the mind of a reasonable physician or pharmacist; (g) patient deaths; and (h) prescribing inappropriate and dangerous combinations of drugs to patients.

151.   Several red flags have been identified regarding SYED's controlled substances prescribing activities.  In my training and experience, when a physician exhibits multiple red flags, the risk of patients diverting or abusing drugs is significantly increased and increases the risk to public safety.  This also increases a physician's exposure to facilitating drug-seeking behavior that patients that may be exhibiting.  The presence of numerous red flags may also call into question that a physician may not be prescribing within the scope of legitimate medical purpose.  These red flags include the following:

     a.     SYED specializes in psychiatry and is not known to be board certified in pain management nor known to have any pain management specialty, but nonetheless has been and continues to prescribe powerful and dangerous pain medications.  Indeed, between May 1, 2019 through April 30, 2021, despite practicing as a psychiatrist, SYED has prescribed 711 unique narcotic prescriptions for hydrocodone, oxycodone, and tramadol (excluding

buprenorphine products, e.g. Suboxone, which is used to tread opioid addiction) to 26 separate patients.

b.   In addition, between May 1, 2019 through April 30, 2021, SYED prescribed 192 unique prescriptions to 45 separate patients for carisoprodol, a powerful muscle relaxer.  In my training and experience, carisoprodol is not known to provide treatment for any psychiatric conditions.

c.   As described above, SYED accepts cash payments for office visits.  Based on my training and experience, I know that if a physician is a registered or participating provider with health insurance programs, the physician agrees to accept the programs' fee schedule as payment for his services, and not to seek payment from patients outside those fee schedules.  A physician who is accepting cash payments from insured patients may therefore be engaging in a scheme to defraud insurance programs and/or prescribe medications outside of the course of ordinary medical practice.  Throughout its investigations, law enforcement has heard that SYED was willing to take cash in exchange for prescriptions, including from patients that have private insurance or federally funded insurance such as Medicaid.

152.   Based on my training and experience SYED's prescribing conduct raises additional red flags.  For example, SYED prescribed E.R. the "holy trinity" and "quaternity" of drugs—a dangerous and potentially lethal combination of highly addictive drugs.  E.R. received this combination approximately 13 times from December 12, 2017 through November 13, 2018. Furthermore, a review of the CT PMP between May 2019 and April 2021, demonstrates that three patients received a "holy trinity" prescription at least once and two patients received a "quaternity" prescription.

153.   As to his prescribing habits, SYED frequently issues prescriptions to patients for the highest available doses for certain controlled substances, which puts a patient at increased risk for diverting or abusing their medication.  When combined with multiple controlled substances, this further increases the risk of patients diverting or abusing their medication.

154.   The FDA states that buprenorphine "doses higher than 24mg/6mg have not been demonstrated to provide any clinical advantage."  Despite this, SYED provided prescriptions for buprenorphine above 24 milligrams to three patients during the time period of May 1, 2019 through

April 30, 2021. In addition, 38% of SYED's patients receive the maximum recommended dose of buprenorphine products.

155.    Regarding alprazolam, the FDA also recommends that for panic disorders, a patient may receive up to 10 milligrams per day. Additionally, up to 4 milligrams may be prescribed for anxiety disorder. Approximately 76% of SYED's patients who receive alprazolam prescriptions, receive 4 milligrams or above.

156.    Regarding clonazepam, the FDA recommends that for seizure disorders, a patient may receive up to 20 milligrams per day. Additionally, up to 4 milligrams per day may be prescribed for panic disorder. Approximately 63% of SYED's patients who receive clonazepam prescriptions receive 4 milligrams or above.

157.    Based upon information received from the State of Connecticut Department Consumer Protection Drug Control Division ("CT DCP"), SYED is an outlier in controlled substances prescriptions as compared to his peers. Information provided from the CT DCP indicates that SYED identifies himself as a psychiatrist. CT DCP compared SYED to other prescribers that identified themselves as being in Psychiatry (General Practice), Psychiatry/Mental Health, Psychiatry & Neurology, and Addiction Psychiatry for the second and third quarters of 2020. CT DCP analyzed prescribing data state-wide in Connecticut for controlled substances that are considered anxiolytic (benzodiazepines such as Xanax or Klonopin) and sedatives hypnotics (sleep aids such as Ambien or Belsomra).

158.    During the second quarter of 2020, SYED ranked second out of 378 prescribers in monthly average prescriptions prescribed for anxiolytic/sedative/hypnotic medications with an average of 625 prescriptions prescribed. The monthly average for similar prescribers is 53. In addition, out of the 378 prescribers, SYED was also ranked second for monthly average dosage

units prescribed for anxiolytic/sedative/hypnotic medications with an average of 50,231.2 dosage units prescribed. The monthly average for similar prescribers is 3,254.2. These averages indicate that SYED prescribed over ten times more prescriptions and over ten times more dosage units on average than his peers in the second quarter of 2020.

159.    During the third quarter of 2020, SYED ranked second out of 386 prescribers in monthly average prescriptions prescribed for anxiolytic/sedative/hypnotic medications with 656 average prescriptions prescribed.  The monthly average for similar prescribers is 54. In addition, out of 386 prescribers, SYED was ranked first in the quarter for monthly average dosage units prescribed for anxiolytic/sedative/hypnotic medications with an average of 52,772.7 dosage units prescribed.  The monthly average for similar prescribers is 3,359.8.  These averages indicate that SYED prescribed over ten times more prescriptions and over ten times more dosage units on average than his peers in the third quarter of 2020.

160.    An analysis of Medicaid claims data from January 2016 to May 2021 reveals that many of SYED's patients are utilizing their Medicaid insurance to pay for their medications prescribed by SYED, however there are no corresponding office visits, or other services, billed to these patient's Medicaid by SYED.  At least two of these patients include the above described patients, N.M. and E.R.  As described above in paragraph 21, if a physician is a registered or participating provider with health insurance programs, the physician agrees to accept the programs' fee schedule as payment for his services, and not to seek payment from patients outside those fee schedules.

161.    As a Medicaid provider, SYED agrees not to charge Medicaid patients for any Medicaid covered services, which would include medical office visits.  The fact that SYED is not billing Medicaid for office visits, or other services, yet has been prescribing controlled substances

to these same patients is a red flag.  This could mean that SYED is either not seeing the patients in the office yet prescribed them medications on an ongoing basis without medical evaluation, or that SYED is charging patients qualifying for Medicaid—generally low-income persons—cash for the visits rather than billing their insurance.  A physician who is accepting cash payments from insured patients may be engaging in a scheme to defraud insurance programs and/or prescribe medications outside of the usual course of professional practice.

162.    When SYED prescribes medications to a Medicare or Medicaid patient, the prescription is sent to a pharmacy.  That pharmacy fills the prescription and bills the patient's Medicare or Medicaid insurance.  Medicare or Medicaid then pays the pharmacy for that medication. The pharmacy fills the prescription relying on SYED's determination that the medication and dose are medically necessary.  Medicare and Medicaid pay the pharmacy for dispensing the medication relying on the representation that the medication is medically necessary.

163.    Between January 1, 2016 and May 8, 2021, based on SYED's prescriptions, Medicare has paid a total of $2,517,720 for medications, $43,141 of which was for schedule II medications including oxycodone.  Additionally, Medicare paid a total of $44,968 for Adderall and alprazolam prescriptions during the time period.  Medicare has paid, in total, approximately $501,553 to SYED for office visits and psychotherapy between January 2016 and May 2021, billed under the codes 99213, 99214, 90792, 90833, and 90836.

164.    Between January 1, 2016 and April 8, 2021, Medicaid has paid a total of $15,834,753 for medications prescribed by SYED, of which about $533,943 was for schedule II medications including oxycodone.  Additionally, Medicaid paid a total of $354,343 for Adderall and alprazolam prescriptions during the time period.  Medicaid has paid a total of about $463,822

SYED for office visits and psychotherapy between January 2016 and April 2021, billed under the codes 99213, 99214, 90792, 90833, and 90836.

165.    Through my education, training, and experience as a registered nurse in the fields of oncology and hospice care, I believe that SYED has been overprescribing controlled substances to a number of patients as described within this affidavit, and that the health records maintained at the SYED's offices and home will contain evidence that SYED is prescribing medically unnecessary quantities of controlled substances.  A review of Medicare and Medicaid claims data and the CT PMP data reveals that SYED is fraudulently causing Medicare, Medicaid and other commercial insurance companies to pay for these medically unnecessary controlled substances, under the false pretense that these prescriptions are for legitimate medical reasons based on SYED's professional judgment.

**L.  March 2020 Surveillance of SYED**

166.    After SYED's March 18, 2020 visit with CS-3, DEA agents and task force officers surveilled SYED.  At approximately 6:19 PM, SYED exited the rear door of 72 North St. Danbury, CT (SYED's former medical practice building) carrying a dark colored briefcase, similar to the bag observed in the videos of CS-2 and CS-3.  SYED opened the trunk of his Honda CRV bearing Connecticut registration AV76782 and placed the briefcase inside.  SYED was then observed entering the driver seat of a Honda CRV.  SYED then backed out of the parking spot and exited the parking lot.  Surveillance was maintained on SYED until he reached a shopping plaza at 5 Padanaram Rd in Danbury, Connecticut. At approximately 6:29 PM, SYED parked his vehicle and walked into the India Kitchen Restaurant at this location.  SYED was empty handed when he exited the vehicle and entered the restaurant. At approximately 6:35 p.m., SYED was observed sitting at a table in the far corner of the restaurant eating dinner.

167.    At approximately 7:32 p.m., SYED exited the restaurant and entered his vehicle. Surveillance was maintained on SYED as he traveled directly from the India Kitchen Restaurant to his residence.  A DEA agent arrived at the residence prior to SYED and other members of the surveillance team.   Prior to SYED's arrival, the DEA agent observed a black 4 door Nissan Maxima parked in the driveway of the residence. At approximately 7:50 PM, SYED arrived and parked in the driveway of his residence in front of the right-hand garage door as the left-hand garage door was opening. SYED exited the vehicle and retrieved a dark colored briefcase from the trunk of the vehicle and then proceeded to enter the left-hand garage door.  A moment later the left-hand garage door closed.

**M. May 2021 Surveillance of SYED and His Practice**

168.    On May 12, 2021, at approximately 4:30 p.m., agents and TFOs from the DEA established surveillance at the Danbury office.  Surveillance located SYED's vehicle, a grey Honda CRV bearing Connecticut registration number AV76782, parked and unoccupied in a handicap spot in front of the building.

169.    At approximately 4:45 p.m., SYED exited the front of the building carrying a black soft sided case/bag. SYED proceeded to open the trunk of the vehicle and place it inside. SYED was then observed closing the trunk and locking the vehicle. SYED then returned inside the building.

170.    At approximately 5:00 p.m., agents observed a black Volkswagen Jetta arrive and park in front of the building. A check of the CT DMV database revealed this vehicle was registered to C.F. A subsequent check of the CT PMP indicated that C.F. is a patient of SYED's who receives Suboxone 16mg, Clonazepam 6mg, Gabapentin 900mg, and Adderall 40mg. Agents observed a white female matching the CT DMV photo of C.F. exit the vehicle and enter the building.  At

approximately 5:15 p.m., C.F. was observed exiting the building, entering the Volkswagen Jetta, and leaving the area.

171.    At Approximately 5:32 p.m., a DEA TFO observed a white Ford Escape enter the parking lot of SYED's office. Agents noted that in addition to the driver there was also a passenger in the vehicle. A check of the CT DMV database revealed this vehicle was registered to T.P. A check of the CT PMP database indicated that T.P. is a current patient of a different physician in Danbury, CT, and is receiving Adderall from that physician. The two individuals were observed exiting the vehicle and walking towards the entrance to the building. Agents immediately noticed the behavior of the passenger to be erratic. At approximately 5:35 p.m., agents observed the passenger access the buzzer doorbell system and shortly after, the door was opened and both individuals entered the building.

163.    At approximately 6:10 p.m., T.P. exited the front door and walked towards his/her vehicle. Agents observed that T.P. was seemingly upset if not angry. T.P. entered his/her vehicle and left the parking lot without waiting for the passenger who was still inside. Based on training and experience, DEA agents and TFOs believe that the passenger may have been attempting to introduce T.P. to SYED in order to receive prescriptions.

172.    At approximately 6:15 p.m., the passenger from T.P.'s vehicle exited the building carrying what appeared to be handwritten prescriptions. The passenger then was observed approaching several vehicles in the parking lot and knocking on the windows. Eventually, the passenger approached the TFO's vehicle. Based on training and experience, agents and TFOs from the DEA believe this individual was intoxicated and was unsure of what vehicle he/ she had arrived in. Additionally, he/she may not have realized that T.P. left him/her at the doctor's office.

The passenger then re-entered the building. A few minutes later, the DEA TFO observed the female sitting outside the building smoking cigarettes and making phone calls.

173.   At approximately 6:30 p.m., T.P. arrived back at SYED's office. At this time surveillance observed the passenger enter T.P.'s vehicle and they exited the area.

174.   At approximately 7:00 p.m., SYED exited the front of the building carrying one black rectangular briefcase, similar to the bag observed in the videos of CS-2 and CS-3, and a black soft sided bag slung over his shoulder. SYED placed the bags into the rear passenger seat area of the Honda CRV. SYED then got into the driver seat and a short time later exited the parking lot. Surveillance units followed SYED directly to his residence. Agents observed SYED park his vehicle in front of the right-side garage door and walk around to the passenger side to retrieve the black briefcase and black soft sided bag. SYED proceeded to walk directly into the garage of the home and close the garage door. Agents observed that SYED did not retrieve the smaller black case/bag from the trunk area of the vehicle. At this time surveillance was terminated.

**N. June 2021 Surveillance of SYED and His Practice**

175.   On June 2, 2021, at approximately 6:55 a.m., surveillance was established at 26 Whitewood Road, Newtown, CT. Surveillance located three vehicles parked in the driveway of the residence and both garage doors closed. A Toyota Prius bearing a Lexus are known to investigators as vehicles SYED has operated during the course of this investigation. Surveillance conducted a check of the CT DMV database for the third vehicle bearing a New York registered and it was found to be registered to an N.S.

176.   At approximately 7:45 a.m., a DEA agent driving past the residence observed the left side garage door of open and observed SYED standing in the threshold of the interior garage door. SYED walked towards the Toyota Prius carrying a black rectangular briefcase, similar to the

one seen in the video recordings of CS-2 and CS-3, a black soft sided bag over his shoulder, and a small soft sided blue bag. SYED placed all three bags in the rear passenger side door of the Toyota Prius and entered the driver seat. Surveillance units followed SYED out of his neighborhood and onto Rt. 84 West. At this time, 84 West was bogged down with bumper to bumper traffic due to an accident beyond exit 7. Two DEA agents maintained surveillance on SYED as he travelled in the direction of the Danbury office while two other DEA agents exited the highway and travelled directly to the Danbury office.

177.    At approximately 8:15 a.m., DEA agents arrived at the medical practice to establish surveillance for SYED's arrival at his Danbury office. Surveillance was established outside at a table in front of a cafe located next to SYED's Danbury office. DEA agents observed two individuals standing in the vicinity of the door to SYED's office. Both parties were conversing and were complaining that SYED was late. One of the individuals was later identified through a CT DMV check as J.C. A review of the CT PMP for J.C. revealed that J.C. is a patient of SYED and is receiving prescriptions for 60 Adderall 30 mg tabs and 60 Clonazepam 1 mg tabs monthly from SYED. J.C. is also receiving Suboxone from another provider.

178.    At approximately 8:35AM, DEA agents observed SYED pull into the parking lot of his office and park in the handicap spot in front of the Danbury office. SYED was observed exiting the vehicle. He then acknowledged J.C. and the other individual that were outside waiting. SYED was observed approaching the rear passenger side door of his vehicle. SYED was then observed removing a black rectangular briefcase (similar to the one seen in the video recordings of CS-2 and CS-3), a black soft sided bag, and a blue soft sided bag that appeared to be a lunch box. SYED then proceeded to the front door and greeted J.C. and the other individual. At approximately 8:39AM SYED, J.C. and the other individual entered the building together.

## O. **Location of Patient and Business Records**

179.    Based on my training and experience as a registered nurse and a special agent, I know that medical providers must maintain patient medical files in order to provide support for patient medications and billing transactions if later questioned by insurers, vendors, the Internal Revenue Service, and federal or state regulatory agencies, and in fact are required by law to keep such records for a period of seven years from the date of service.  Physicians typically maintain these patient records within their office as they must have access to them when seeing patients.  I also know that physicians may bring patient records to their home, especially when they are a sole provider with no other physicians or covering providers within their practice.  Physicians may receive calls from patients after hours, especially when a physician is a mental health provider, as patients may be reaching out in times of mental health crises.  Physicians would need to access patient files from their home if they are to accurately provide medical advice to their patients.  In addition, between March 2020 and May 2021, the coronavirus pandemic has affected medical providers across the country causing physicians to begin providing medical care over the phone from other locations than the physicians main office.

180.    Based on my investigation, SYED is known to keep hard copy patient records and does not maintain an electronic health record.

181.    Based on my investigation, I believe that SYED keeps patient files at SYED's home and offices.  On June 8, 2021, this affiant placed a ruse telephone call to SYED's office; nobody answered, and this affiant left a voicemail asking for [someone] to return the call.  On June 9, 2021, this affiant placed a call to S.K.'s cell phone and left another voicemail.  That same day, S.K. returned the call.  This affiant explained that she worked for the Department of Health and Human Services and was tasked with reaching out to mental health providers during the pandemic to ask

certain survey questions. S.K. told the affiant that she would try to answer the questions because SYED "would probably not return the call." During the call, S.K. confirmed that SYED does not maintain an electronic medical record and that SYED's patient files are paper files. S.K. told the affiant that the patient files were stored at SYED's home and that he brings the ones he needs that day with him when he comes to the office. S.K. also confirmed the addresses of the Danbury office and the New Haven office.

182.    In addition, video recordings of office visits conducted between CS-2 and CS-3 reveal a black rectangular briefcase that is seen in the Danbury office and the New Haven office. This appears to be the same briefcase that DEA agents observed SYED carrying from the Danbury office and the New Haven office to SYED's home. The video recordings also show SYED writing on pieces of paper kept in manila folders, presumably patient files.

183.    Furthermore, based on my investigation I know that SYED previously stated that he keeps his patient files at his home. For example, in an interview on November 15, 2013 conducted by the State of Connecticut's Office of the Attorney General, SYED stated that he keeps the records of his medical practice at his home and that he takes the files with him when he is seeing patients at the office.

184.    I know based on my training and experience that during the course of normal business practices, specifically physician practices, telephone communications occur regularly. Pharmacists often call physicians to verify prescription doses. Other medical providers may also contact physicians' offices regarding common patients in order to collaborate about patient care. I know that SYED has a secretary, S.K, and based on the office visit video of CS-2, I know SYED has a receptionist at the New Haven office. It is common for secretaries and receptionists to take these calls and messages for the physician to call back when they are done seeing patients.

Oftentimes secretaries and receptionists will take notes regarding these messages. As outlined in above, pharmacists left several messages for SYED. As outlined in above, staff from Rushford faxed letters to SYED regarding concerns they had for patients of SYED. As outlined in paragraph 120, Physician Witness #1 tried calling SYED regarding his patients and left several messages. Based on this information I believe that there will be notes and/or papers containing evidence such as these letters and messages within the Danbury office and the New Haven office.

### ADDITIONAL FACTS SPECIFICALLY RELATED TO FORFEITURE

185.    Part of the provider agreement for Medicaid requires the doctor to agree that, "To accept payment as determined by DSS or its fiscal agent in accordance with federal and state statutes and regulations and policies as payment in full for all services, goods, and products covered by Connecticut Medical Assistance Program and provided to program clients." This provision does not allow a doctor to separately or independently charge a Medicaid recipient for services.

186.    SYED, as a provider under this program, agreed to this provision.

187.    To participate in the Medicare program as a "Participating Practitioner," SYED would have to fill out forms 855 and 460, among other forms.

188.    Form 460 requires the doctor to agree that, "Under an assignment, the approved charge, determined by the MAC/carrier, shall be the full charge for the service covered under Part B. The participant shall not collect from the beneficiary or other person or organization for covered services more than the applicable deductible and coinsurance."

189.    SYED, is a "Participating Practitioner" under this program, and therefore agreed to this provision.

190.    On June 16, 2021, law enforcement searched SYED's offices and home.

191.    During the search, law enforcement found a large volume of paper deposit receipts from Chase Bank Account Ending in 3988. These receipts tended to show cash deposits two to four times a week. The cash deposits were generally in even amounts, *e.g.*, $800.00, $450.00, $500.00, and $650.00.

192.    Based on a review of the paper deposit receipts, the cash deposits were generally made in Newtown, Connecticut, where SYED and his wife reside. The majority of these deposits were made between 10am and 1pm.

193.    As set forth above, based on SYED's interactions with the confidential sources, SYED would make Medicare / Medicaid patients pay cash for their office visits, but these same patients would then charge Medicare / Medicaid for the cost of their associated prescriptions.

194.    Based on prior surveillance of SYED, I believe that SYED was generally working during this time. I believe, therefore, based on the timing of the deposits, the amount of the deposits, and the location of the deposits, that SYED's wife (or someone on his behalf) was making these deposits on SYED's behalf the day after he collected the money from his patients.

195.    The following chart sets forth examples of instances where SYED saw patients that were covered by Medicare / Medicaid and did not charge Medicare / Medicaid for the office visit. Those patients filled their prescriptions, utilizing their Medicare or Medicaid insurance, and SYED or his wife deposited cash into Chase Bank Account Ending in 3988. This demonstrates that SYED has engaged in a pattern of health care fraud by failing to honor the provider agreement(s) and taking cash directly from patients in exchange for prescriptions for controlled substances.

| Date of scripts written | Number of patients received scripts w/ no office visit | Date of cash deposit | Amount of cash deposit |
|---|---|---|---|
| 2/20/2020 | 2 | 2/21/2020 | $    50.00 |
| 5/5/2020 | 14 | 5/6/2020 | $ 1,000.00 |
| 12/15/2020 | 22 | 12/16/2020 | $    660.00 |

| 12/23/2020 | 11 | 12/24/2020 | $ 570.00 |
| 1/5/2021 | 27 | 1/6/2021 | $ 750.00 |
| 1/6/2021 | 7 | 1/7/2021 | $ 460.00 |
| 1/7/2021 | 16 | 1/8/2021 | $ 400.00 |
| 1/12/2021 | 21 | 1/13/2021 | $ 830.00 |
| 1/20/2021 | 10 | 1/21/2021 | $ 985.00 |
| 1/21/2021 | 4 | 1/22/2021 | $ 60.00 |
| 1/26/2021 | 12 | 1/27/2021 | $ 475.00 |
| 2/3/2021 | 12 | 2/4/2021 | $ 280.00 |
| 2/4/2021 | 6 | 2/5/2021 | $ 330.00 |
| 2/10/2021 | 12 | 2/11/2021 | $ 460.00 |
| 2/16/2021 | 20 | 2/17/2021 | $ 415.00 |
| 2/17/2021 | 15 | 2/18/2021 | $ 505.00 |
| 2/24/2021 | 9 | 2/25/2021 | $ 250.00 |
| 3/2/2021 | 25 | 3/3/2021 | $ 720.00 |
| 3/3/2021 | 8 | 3/4/2021 | $ 300.00 |
| 3/4/2021 | 10 | 3/5/2021 | $ 700.00 |
| 3/9/2021 | 19 | 3/10/2021 | $ 900.00 |
| 3/10/2021 | 4 | 3/11/2021 | $ 480.00 |
| 3/24/2021 | 3 | 3/25/2021 | $ 340.00 |
| 3/25/2021 | 2 | 3/26/2021 | $ 500.00 |
| 3/30/2021 | 6 | 3/31/2021 | $ 540.00 |
| 3/31/2021 | 2 | 4/1/2021 | $ 315.00 |
| 4/6/2021 | 9 | 4/7/2021 | $ 660.00 |

196.    SYED has previously been fined by the State of Connecticut for billing for services at a higher rate than what was actually being performed (see above). SYED's acceptance of cash for office visits instead of billing insurance also serves to prevent scrutiny and potential fines by Medicare and Medicaid. When a provider bills a large number of office visits per day, it is a red flag for insurance companies because it is unlikely that the provider is actually seeing and providing adequate services to the patients.   This, in turn, may cause Medicare and Medicaid to perform an audit of the provider.

197.    For example, in the table above, on January 5, 2021, SYED issued prescriptions to 27 Medicaid patients that **did not** have a corresponding office visit billed to Medicaid. On that same date, a review of Medicaid claims data indicates that SYED billed Medicaid for office visits

for an additional 11 patients. SYED billed Medicaid for either 15 minute or 25-minute office visits for these 11 patients. SYED also billed Medicare for office visits for an additional two patients on January 5, 2021. According to this review of data, therefore, SYED potentially saw at least 40 patients on January 5, 2021 (27 individuals with prescriptions and but no corresponding office visit; 11 individuals with office visits billed to Medicaid; and 2 individuals with office visits billed to Medicare). This does not account for any patients that may have paid SYED with commercial insurance.  By taking cash for office visits and not billing insurance, SYED is avoiding an audit for billing large numbers of office visits per day and avoiding potential monetary fines.

198.   A review of Medicaid claims data reveals that Medicaid pays the provider an average of approximately $43 for each 15-minute office visit.  SYED, however, charged CS-2 $50 in cash for his/her visit on February 29, 2020. On June 10, 2020, SYED charged CS-3 $75 in cash for his/her office visit.   SYED, therefore, may be violating his contracts with Medicare and Medicaid by charging patients more, and requiring cash, than he would be entitled to reimbursement under Medicare and/or Medicaid.

199.   During the search of SYED's offices and home, law enforcement found patient files related to SYED's practice.  Upon an initial review of the patients' files, SYED's documentation was inadequate on its face.  Specifically, many files lacked evidence of why patients were prescribed medication, lacked evidence of medical or physical exams, and files lacked continuity as to patient care.  Some of the files were just notes on a blank page.  Generally, the files lacked evidence of drug screening; this drug screening is useful to monitor patients taking controlled substances.  The files generally lacked evidence that would the support the issuance of the prescriptions identified in the table above.  SYED is required to maintain patient files that adequately document the treatment and need thereof.  The medical necessity cannot be determined

from the patient files, therefore I believe that SYED's issuance of the prescriptions, and the subsequent billing to Medicaid and Medicare, represents a scheme to defraud Medicaid and Medicare.   Alternatively, the prescriptions written by SYED lacked medical justification and legitimate medical purpose or were outside the usual course of professional practice and represent the distribution of controlled substances in violation of the Controlled Substances Act.

## **CONCLUSION**

200.    Based upon the foregoing, information described above, I submit that probable

cause exists to believe the funds listed above and held in the account listed above were obtained

by knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud

any health care benefit program; or to obtain, by means of false or fraudulent pretenses,

representations, or promises, any of the money or property owned by, or under the custody or

control of, any health care benefit program, in violation of 18 U.S.C. § 1347 and/or constitute

proceeds from prescribing a controlled substance without a legitimate medical purpose or outside

the usual course of professional practice in violation of 21 U.S.C. § 841 and are therefore, subject

to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and/or 21 U.S.C. § 881(a)(6).  I request that

the Court issue a seizure warrant for the defendant account pursuant to 18 U.S.C. 981(b) for the

contents of Chase Bank Account Ending in 3988 held in the name of Naimetulla A. Syed and

Shahnaz T. Syed.

Emma Dugas
Special Agent
United States Department of Health and Human Services
Office of the Inspector General, Office of Investigations

The truth of the foregoing affidavit has been attested to me by Special Agent Emma Dugas on
this _22nd_ day of _June_ , 2021, at _3:52pm_

/s/ S. Dave Vatti

HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE